J-A29031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| RAYSHAWN WILLIAMS, | : | |
| | : | |
| Appellant | : | No. 537 WDA 2015 |

Appeal from the Judgment of Sentence February 25, 2015
in the Court of Common Pleas of Allegheny County,
Criminal Division, No(s): CP-02-CR-0012281-2013;
CP-02-CR-0014922-2014

BEFORE:  DUBOW, MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED JANUARY 19, 2017**

Rayshawn Williams ("Williams") appeals from the judgment of sentence entered following his conviction of first-degree murder and persons not to possess or use a firearm.[1]  We vacate the judgment of sentence and remand for a new trial.

On July 31, 2013, at approximately 4:00 p.m., three men and the victim, Derick Lyman ("Lyman"), argued in the hallway outside of the apartment where Lyman lived with his girlfriend, Tayla Wright ("Wright").  In that verbal altercation, the three men, known to Wright as "Tay Tay," "J-Zombie" and "Judd," argued with Lyman about "someone's brother getting robbed."  Trial Court Opinion, 1/19/16, at 6 (citation omitted).  Following the argument, Tay Tay and Judd went into the apartment of Natwauna Lane

---

[1] 18 Pa.C.S.A. §§ 2501(a), 6501(a)(1).

("Lane") (known to Wright by the nickname, "Nay Nay"). Lyman and J-Zombie walked up the street to J-Zombie's house. Lyman thereafter returned to his apartment.

At about 5:51 p.m., Wright looked out of the window and observed Williams approaching her apartment building.[2] Shortly thereafter, Williams knocked loudly on Wright's apartment door. When Wright opened the door, Williams told Wright that he was "looking for some answers," at which time Lyman walked into the hallway with Williams. As she started to follow Lyman, Wright observed Tay Tay and Judd standing with Williams, and Lane standing in the hallway, listening to the conversation.

Wright subsequently gathered her daughter and walked out into the hall, in order to leave the building. As she left, she observed Williams, Lyman, Tay Tay, Judd and Lane standing in the hallway. At that time, Wright advised Lyman to go back to their apartment.

Once outside of the apartment, and after giving her daughter to a friend, Wright moved her vehicle from the front of the building to the back of the building. As Wright walked back to the building's entrance, Williams ran past her. As Williams did so, two girls screamed, at which time Williams told the girls, "homeys, I'm not going to shoot you." Wright observed that Williams was carrying a gun in his right hand, and running with his hoodie pulled up a "little bit over his face." *Id.* (citation omitted).

---

[2] Wright recognized Williams as "Ray Ray," from the Homewood neighborhood in which she grew up.

Wright's mother screamed at Wright to get inside, as someone had just been shot. Once inside, Wright found Lyman lying on the hallway floor, near Lane's door. Although Lyman was transported to the hospital, he died as a result of multiple gunshot wounds.

At the hospital, Wright spoke with Pittsburgh Police Detective Harry Lutton ("Detective Lutton"), and identified the shooter as "Ray Ray." Thereafter, at police headquarters, Wright identified Williams as the assailant, from a collection of photographs in a binder.

Several days later, Williams was arrested. At the police station, upon being informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), Williams elected to remain silent. However, as police detectives were leaving the room, Williams inquired as to whether he could ask the detectives a question. When the detectives responded in the affirmative, Williams stated, "[w]hat happens now?" and "what did I do?" Trial Court Opinion, 1/19/16, at 13 (citation omitted). The detectives again explained the allegations against Williams, to which Williams responded, "That's not me. Check me out. Check my charges. I'm a drug dealer. I deal drugs." *Id.* When the detectives asked Williams about video surveillance footage, Williams stated, "That's it. I'm done talking." *Id.*

Williams filed pretrial suppression Motions seeking to suppress, *inter alia*, his statement to police: "That's it, I'm done talking." N.T. (Pretrial Hearing), 4/16/14, at 5-7). Williams also sought to suppress Wright's

identification of Williams from the binder of photographs. The trial court denied Williams's suppression Motions. The jury ultimately convicted Williams of the above-described charges, after which the trial court sentenced Williams to an aggregate prison term of life in prison. Williams filed a Post Sentence Motion, which the trial court denied. Thereafter, Williams filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal.

Williams presents the following claims for our review:

I. Did the trial court err in denying the "Motion to Suppress Photo Array Identifications Made by [Wright,]" where the identification procedure was highly suggestive and the Commonwealth failed to establish an independent basis for [] Wright's identification of [] Williams?

II. Did the trial court abuse its discretion by allowing Detective [Hal] Bolin ["Detective Bolin"] to impeach [Lane] with her prior inconsistent statements[,] where the probative value of this testimony was outweighed by the danger of prejudice?

III. Did the trial court err in denying [] Williams'[s] Motion to Suppress statements where the Commonwealth failed to present any evidence at the suppression hearing to rebut [] Williams'[s] assertions that the statements were unconstitutionally obtained?

IV. Did the trial court abuse its discretion by allowing the Commonwealth to present [] Williams'[s] post-arrest, post-*Miranda* silence as substantive evidence of guilt?

Brief for Appellant at 6 (some capitalization omitted, issues renumbered).

Williams first claims that the trial court improperly denied his Motion to suppress Wright's pretrial identification of him from a binder of photographs. *Id.* at 56. Williams argues that the evidence presented at the suppression

- 4 -

hearing "undeniably established that the photograph identification procedure was unduly suggestive." *Id.* According to Williams, the trial court improperly denied suppression "without hearing any evidence to establish an independent basis for Wright's identifications." *Id.* Claiming that the photo array was unduly suggestive, Williams states that the police presented Williams with a binder containing two to three hundred photographs, which were color-coded by neighborhood and identified the individuals by name. *Id.* at 60-61. Williams asserts that his name was listed under his photograph, in the Homewood section of the binder, under the heading "Ra[ce] Street Crips." *Id.* at 61. In addition, Williams asserts that the binder, the "Zone 5 Gang Book," was unduly suggestive as it only contained photographs of suspected gang members. *Id.*

In its Opinion, the trial court set forth the appropriate law, addressed Williams's first claim and concluded that it lacks merit. *See* Trial Court Opinion, 1/19/16, at 20-27. We agree with and adopt the conclusion reached by the trial court, and affirm its resolution of Williams's claim on this basis. *See id.*

In his second claim, Williams argues that the trial court improperly allowed the Commonwealth to call Detective Bolin, "strictly to impeach [Lane] with her previous inconsistent statements that [] Williams was present in her apartment building shortly before the shooting." Brief for Appellant at 65. According to Williams, Lane's prior statements "bore

- 5 -

directly on the central issue at trial: the identity of the shooter." ***Id.*** Williams posits that the jury improperly used the testimony as substantive evidence of his guilt, despite a cautionary instruction by the trial court. ***Id.*** Williams directs our attention to case law in which testimony regarding prior inconsistent statements was deemed too prejudicial to be admissible at trial. ***Id.*** at 66-69.

The trial court set forth the relevant law in its Opinion, addressed Williams's claim, and concluded that it lacks merit. ***See*** Trial Court Opinion, 1/19/16, at 27-31. We agree with the sound reasoning of the trial court, as set forth its Opinion, and affirm on this basis as to Williams's second claim. ***See id.***

In his third claim, Williams argues that the trial court improperly denied his suppression Motion, where the Commonwealth failed to present evidence at the hearing to rebut Williams's claim that his statements to police were unconstitutionally obtained. Brief for Appellant at 29-30. According to Williams, it was the Commonwealth's burden to produce such evidence at the suppression hearing. ***Id.*** at 30. Williams asserts that the Commonwealth presented no evidence at the suppression hearing that would meet this burden and, therefore, the statements should be suppressed. ***Id.*** at 32. Williams states that he preserved his challenge by filing his Motion to suppress his statement. ***Id.*** at 31.

In its Opinion, the trial court set forth the appropriate law, addressed Williams's claim, and concluded that it lacks merit. *See* Trial Court Opinion, 1/19/16, at 10-12. We agree with and adopt the trial court's reasoning. *See id.* We additionally note the following.

At the suppression hearing, the Commonwealth did not dispute Williams's factual basis for his suppression Motion. The Commonwealth agreed with the assertion in Williams's Motion that, after police had arrested Williams and told him of his rights pursuant to *Miranda*, Williams invoked his right to remain silent. N.T., 4/15/14, at 4-6. The Commonwealth agreed that Williams reinitiated questioning, after invoking *Miranda*, when he asked the officers why he was going to jail. *Id.* The Commonwealth agreed that Williams told police that he did not commit the homicide, and that he "is a drug dealer." *Id.* at 5, 6. The Commonwealth did not dispute that the police officers then asked Williams, "What about the surveillance video?" *Id.* at 5, 6. Finally, the Commonwealth did not dispute that Williams told the officers that he was not going to say anything else, and that he was done talking. *Id.*

At the hearing, defense counsel and the Commonwealth disagreed as to the application of the law to the facts, as stated by both counsel. *Id.* at 6-7. Defense counsel offered no objection to the trial court hearing argument as to the legal basis for Williams's Motion. *See id.* Under these circumstances, we agree with the suppression court's conclusion that

- 7 -

Williams waived his challenge to the Commonwealth's failure to present evidence at the suppression hearing, by failing to raise the issue before the trial court. *See* Pa.R.A.P. 302(a) (stating that an issue cannot be raised for the first time on appeal).

Finally, Williams challenges the denial of his Motion to suppress his post-arrest statement to police, "That's it. I'm done talking." Brief for Appellant at 46. Williams contends that this statement was taken in violation of his Fifth Amendment right against self-incrimination. *Id.* Williams argues that the admission of this statement violated his constitutional right to remain silent under the Fifth Amendment to the United States Constitution, and Article I, Section 9 of the Pennsylvania Constitution. *Id.*

> As our Supreme Court has explained,
>
> questions concerning the admissibility of evidence are within the sound discretion of the trial court and will only be reversed upon a showing that the court abused its discretion. *Commonwealth v. Johnson*, 615 Pa. 354, 42 A.3d 1017, 1027 (Pa. 2012). An abuse of discretion occurs where "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record." *Commonwealth v. Randolph*, 582 Pa. 576, 873 A.2d 1277, 1281 (Pa. 2005). However, to the extent the question presents as "an issue involving a constitutional right, it is a question of law; thus, our standard of review is *de novo*, and our scope of review is plenary." *Commonwealth v. Baldwin*, 619 Pa. 178, 58 A.3d 754, 762 (Pa. 2012).

*Commonwealth v. Adams*, 104 A.3d 511, 517 (Pa. 2014).

Both the United States Constitution and the Pennsylvania Constitution protect every person against being compelled to be a witness against himself or herself. U.S. Const. amend. V; PA. CONST. article I, § 9.[3] In **Commonwealth v. Molina**, 104 A.3d 430 (Pa. 2014), an evenly divided Pennsylvania Supreme Court "view[ed] the drawing of an adverse inference from a defendant's silence to be encompassed within the right against compelled self-incrimination." **Id.** at 450. "[A]llowing reference to a defendant's silence as substantive evidence endangers the truth-determining process[,] given our recognition that individuals accused of a crime may remain silent for any number of reasons." **Id.** "To violate this rule, the testimony must clearly refer to post-arrest silence." **Commonwealth v. Smith**, 995 A.2d 1143, 1155 (Pa. 2010).

> While we have interpreted the constitutional right against self-incrimination generally to prohibit prosecutors from referencing a defendant's silence as substantive evidence of guilt, this Court has also concluded that the right against self-incrimination is not burdened when the reference to silence is "circumspect" and does not "create an inference of an admission of guilt." [**Commonwealth v.**] **DiNicola**, 866 A.2d [329,] 337 [(Pa. 2005)]. As noted above, "[e]ven an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt." **See id**. (quoting [**Commonwealth v.**] **Whitney**, 708 A.2d [471,] 478 [(Pa. 1998)]).

**Adams**, 104 A.3d at 517.

---

[3] In relevant part, the United States Constitution decrees that "No person … shall be compelled in any criminal case to be a witness against himself." U.S. CONST. Amend. V. The Pennsylvania Constitution dictates that the accused "cannot be compelled to give evidence against himself[.]" PA. CONST. art. 1, § 9.

Pennsylvania Courts "have consistently regarded testimony about a defendant's silence as having an extremely high potential for prejudice." *Commonwealth v. Clark*, 802 A.2d 658, 661 (Pa. Super. 2002); *see also Commonwealth v. Clark*, 626 A.2d 154, 158 (Pa. 1993) (recognizing that "an impermissible reference to the accused's post-arrest silence is innately prejudicial."). Thus, "[a]n impermissible reference to an accused's post-arrest silence constitutes reversible error unless shown to be harmless[.]"[4] *Commonwealth v. Costa*, 742 A.2d 1076, 1077 (Pa. 1999).

Upon our review of the record, we cannot conclude that the error was harmless. At the suppression hearing, the Commonwealth and defense counsel agreed that

---

[4] "An error is harmless if it could not have contributed to the verdict, or stated conversely, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction." *Commonwealth v. Poplawski*, 130 A.3d 697, 716 (Pa. 2015). Our Supreme Court has found harmless error where

> (1) the error did not prejudice the defendant or the prejudice was *de minimis;*
>
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
>
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* at 716 (citations omitted). The Commonwealth has the burden of proving harmless error beyond a reasonable doubt. *Id.*

upon questioning by the police after his arrest, [Williams] invoked his right to remain silent. [The police officers] then told him, "You are going to the jail." He expressed confusion about why. They again said, "Well, you are charged with a homicide." [Williams] said, "No, I don't do that. I'm a drug dealer."

Then they ask[ed] [Williams], "Well, what about the surveillance video?" He said, "I'm not saying anything else."

N.T. (Suppression Hearing), 4/15/14, at 4-5. The trial court denied Williams's Motion to suppress his statement, "I'm not saying anything else." Trial Court Order, 4/15/14.

At trial, Detective Scott Evans ("Detective Evans") testified that, following Williams's arrest, Williams was informed of his *Miranda* rights. N.T., 11/20-21/14, at 92-93. Detective Evans testified as follows regarding his questioning of Williams:

Q. [The Commonwealth]: And you say you read [the *Miranda* warnings] to [Williams]. Do you read it word by word?

A. [Detective Evans]: Yes, sir.

Q. And do you ask him if he understands?

A. Yes, I do.

Q. And as you're going through the form, did he indicate whether or not he understood what you were telling him?

A. He indicated every single time that I asked him—and I asked him three times, "Do you understand this?" And all three times he responded, yes.

Q. And there's one last question, right?

A. Yes.

Q. And what was that question?

- 11 -

A. "Knowing these rights, are you willing to waive your rights and answer questions without the presence of a lawyer?"

Q. And what did he say?

A. No.

Q. What did you do?

A. I got up, and I was walking out of the room, and he said, "Can I ask you a question?" And I sat back down, and I said, "Sure." And he said, "What happens now?" And I told him he was going to be processed on homicide charges. And he said—he asked me, "Well, what did I do?" And I started to explain to him the allegations, my understanding from what I read in the police reports, and that he shot and killed someone in the East Hills housing project in the City of Pittsburgh. And he said, "That's not me. Check me out?" And I said, "Well, apparently there's some video surveillance of the area where this incident occurred." And he said, "Well, that's it. I'm done. I'm done talking. I'm not saying anything else."

Q. And did you conclude the interview at that point?

A. Yes, I did.

*Id.* at 93-94.

The trial court deemed the above statement admissible, opining that

[t]he statement at issue came on the heels of [Williams] denying his involvement in the homicide, and it was admitted to demonstrate the natural progression of the investigation and explain how the detectives' interview with [Williams] concluded. Had it not been admitted, the jury would have been left with even more questions about what had transpired between the detectives and [Williams] during the interview. There would be virtually no context to explain why the interview ended after [Williams] had denied guilt by saying, "That's not me. Check me out" after he was told that he was charged with a homicide….

Trial Court Opinion, 1/19/16, at 17.

However, upon review, the trial court's view that the probative value outweighed the potential prejudice is not supported in the record. Police obtained this statement *after* Williams's arrest, and presumably at the conclusion of its investigation. When read in context, it is clear that Williams's final statement is a re-invocation of his constitutional privilege against self-incrimination. Further, the statement could only be interpreted as Williams's recognition that video surveillance footage would incriminate him. The evidence was not *de minimis*, or cumulative of other, properly admitted evidence. **See Poplawski**, 130 A.3d at 716. Finally, the Commonwealth has failed to prove, beyond a reasonable doubt, that the evidence did not contribute to the verdict. **See Commonwealth v. Noel**, 104 A.3d 1156, 1172 (Pa. 2014) (stating that "the judgment of sentence will be affirmed in spite of the error only where the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict.").

Here, there was no eyewitness to the shooting. Wright testified that earlier that day, she saw that J-Zombie and Judd also possessed firearms. N.T., 11/18-20/14, at 20-21, 230. Wright additionally testified that she did not see Williams with a firearm as he approached her front door, or when he was talking to Lyman prior to the shooting. *Id.* at 232. Lane testified that immediately after the shooting, she saw only Lyman in the hallway outside of her apartment. N.T., 11/20-21/14, at 181. Lane further stated that she

did not see Williams inside of the apartment building or in the hallway prior to the shooting. *Id.* at 171. Although the Commonwealth presented circumstantial evidence of Williams's guilt, we cannot conclude, beyond a reasonable doubt that the admission of Williams's statement did not contribute to the verdict. *See Noel*, 104 A.3d at 1172. Because we cannot conclude that the error in admitting Williams's statement was harmless, we are constrained to vacate the judgment of sentence, and remand for a new trial.

Judgment of sentence vacated. Case remanded for a new trial. Superior Court jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/19/2017

- 14 -

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,     CRIMINAL DIVISION

vs.                                CC No.: 2013-12281
                                        2014-14922

RAYSHAWN WILLIAMS,

Defendant.

OPINION

This is a direct appeal from the judgment of sentence entered on February 25,
2015, following the Defendant's convictions for First Degree Murder and being a Person
Not to Possess or Use a Firearm. The Defendant was originally charged at the
information filed at CC# 2013-12281 with Criminal Homicide (18 Pa.C.S.A. 2501(a)) and
Person Not to Possess, Use a Firearm (18 Pa.C.S.A. 6105(a)(1)). The Person Not to
Possess charge was severed, at the Defendant's request, prior to trial and proceeded
forward at CC# 2014-14922. The Homicide charge was tried to a jury between
November 18, 2014 and November 20, 2014, with a non-jury trial occurring
simultaneously on the severed Person not to Possess or Use a Firearm charge. On
November 25, 2014, the jury convicted the Defendant of First Degree Murder, and this
court found the Defendant guilty of the firearm offense. (Jury Trial Transcript
(hereinafter "TT"), Volume III, November 25, 2014, pp. 126, 133). On February 25,
2015, the Defendant was sentenced to life imprisonment without parole on the murder
charge at CC# 2013-12281, and he received a concurrent sentence of five (5) to ten

(10) years of incarceration for being a Person Not to Possess at CC# 2014-14922. On February 25, 2015, the Defendant filed a Post-Sentence Motion, which was denied on February 27, 2015. This timely appeal followed.

On October 26, 2015, the Defendant filed his Concise Statement of Errors to be Complained of on Appeal ("Concise Statement"),[1] raising the following seven (7) issues for review:

    I.    The trial court erred in denying Mr. Williams' Motion to Suppress a statement he made to police/detectives during a custodial interrogation on August 5, 2013. Following his arrest, Mr. Williams invoked his *Miranda* rights and declined to speak to detectives without an attorney present. Shortly thereafter Mr. Williams expressed confusion over the nature of his charges, at which point a detective referenced video surveillance footage that captured the incident. At that point, Mr. Williams allegedly stated, "That's it. I'm done talking." In the Omnibus Pretrial Motion, trial counsel specifically asserted that this statement was obtained in violation of Mr. Williams right to remain silent as provided by the 5th and 6th amendments of the United States Constitution and Article I §9 of the Pennsylvania Constitution, and should therefore be suppressed. Apart from the Assistant District Attorney's assertions to the contrary, the Commonwealth failed to present any evidence to prove that this statement was constitutionally obtained. Thus, the Commonwealth failed to meet its burden and the statement at issue should have been suppressed.

    II.    Had the Commonwealth presented evidence at the suppression hearing bearing on the constitutionality of Mr. Williams' statement (see issue "I"), the trial court nonetheless erred in denying Mr. Williams' Motion to Suppress this statement. Mr. Williams initially invoked his *Miranda* rights following his arrest on August 5, 2013, and declined to speak with officers/detectives. Since detectives continued to question Mr. Williams concerning a topic that was likely to elicit an incriminating response, the statement at issue was

---

[1] The Defendant received three (3) extensions of time to file his Concise Statement because he was awaiting transcripts.

2

obtained in violation of Mr. Williams' rights under the 5th and 6th amendments of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.

III. Even if suppression was not warranted, the trial court abused its discretion by allowing Mr. Williams' statement to detectives, "That's it, I'm done talking." Under Pa.R.E. 403, the probative value of this evidence was outweighed by the danger of unfair prejudice to Mr. Williams. In making this statement, Mr. Williams merely invoked his constitutional right to remain silent. Yet, by hearing that Mr. Williams refused to speak to police when confronted with the issue of video surveillance footage, the jury may have considered this evidence of Mr. William's guilt.

IV. The trial court erred in denying Mr. Williams' motion to suppress Tayla Wright's pretrial identification and subsequent in-court identifications of Rayshawn Williams, which violated Mr. Williams' due process rights under the U.S. and Pennsylvania Constitutions. On July 31, 2013, police showed Tayla Wright a police "gang book" containing numerous mugshots that were organized by gang affiliation and neighborhood. Additionally, the book displayed the names of the individuals depicted in the mugshots. The Commonwealth failed to prove that this identification procedure did not violate Mr. Williams' due process rights. Based on the content and organization of the "gang book," Tayla Wright's pretrial identification of Mr. Williams was the product of an unduly suggestive identification procedure. Moreover, the Commonwealth failed to present any evidence at the suppression hearing to demonstrate that Ms Wright's pretrial and in-court identifications of Mr. Williams were independently reliable under the factors set forth by the U.S. and Pennsylvania Supreme Courts. Without any evidence to support the independent reliability of Ms. Wright's identifications, her pretrial and subsequent in-court identifications of Mr. Williams should have been suppressed.

V. The trial court abused its discretion by allowing Detective Hal Bolin to impeach Natwauna Lane with statements she allegedly made during an interview a couple days earlier. Specifically, after Ms. Lane denied observing Mr. Williams in her apartment building on the day of the shooting, Detective Bolin testified that Ms. Lane had told him that she saw Mr. Williams talking to the victim in the hallway shortly before the shooting. The Commonwealth acknowledged that these statements were strictly being offered for impeachment purposes, not as substantive evidence. However, the statements should have been prohibited under Pa.R.E. 403 since the probative value of this evidence was outweighed by the

danger of unfair prejudice. Here, the statements at issue bore directly on the only issue at trial: the identity of the shooter. Thus, there was a great risk that, despite a cautionary instruction, the jury would consider Ms. Lane's alleged statements to Detective Bolin as substantive evidence of Mr. Williams' guilt.

VI. The trial court abused its discretion in denying Mr. Williams' post sentence motion that the verdict was against the weight of the evidence. While the Commonwealth's primary witness, Tayla Wright, stated that Mr. Williams was present at the time of the shooting, her testimony was entirely inconsistent and contradictory, and therefore unworthy of belief. Although Ms. Wright identified Mr. Williams as the person who appeared to be shooting into the apartment building, Ms. Wright also stated that Rayshawn Williams-whom she identified as wearing red – had already left the building/area some time before the shooting. *See* N.T., Vol. I, 11/18-20/14, p. 180. Ms. Wright's testimony was critical to the Commonwealth's case as she was the only [] who testified to personally observing Mr. Williams at her apartment building with the victim shortly before the incident. Additionally, while Natwauna Lane testified that the individual in the surveillance video "looks like Ray Ray," she stated that she never saw Mr. Williams at the apartment building on the day of the shooting. As such, the Commonwealth's evidence was so unreliable, incredible, and contradictory that the jury's guilty verdict should shock the conscience of this Honorable Court.

VII. The trial court abused its discretion by allowing Detective Lutton to testify to Tayla Wright's hearsay statements shortly after the shooting. N.T., Vol. I, pp. 291-295. While the Court admitted this testimony as prior consistent statements, such testimony was inadmissible under Pa.R.E. 613(c) as Detective Lutton – not Tayla Wright – was the witness who testified to the prior consistent statements. Thus, defense counsel ("the opposing party") was not given an opportunity to cross-examine the witness about the statements. Pa.R.E. 613(c). Moreover, this constituted hearsay under Pa.R.E. 801. Since no exception to the hearsay rules applied, the statements were inadmissible under Pa.R.E. 802.

(Concise Statement, pp. 3-6).

The Defendant's allegations of error are without merit. For the reasons that follow, the verdicts and sentences should be upheld.

4

## I.    FACTUAL BACKGROUND

On July 31, 2013, at approximately 6:20 p.m., Derrick Lyman, also known as "Ricky," was murdered in the hallway of his apartment building minutes after he was seen and heard having a conversation with the Defendant outside of his apartment. (Jury Trial Transcript, Volume I, ("TT 1") 11/18/14-11/20/14, pp. 139, 146-49, 175-76, 178-79, 189). Ricky resided with his girlfriend, Tayla Wright, in Apartment F of the building located at 2103 Park Hill Drive. (TT 1, pp. 139, 145, 189, 243).

At approximately 5:51 p.m. on the day of his murder, Ms. Wright was in her apartment with the victim, Ricky, and her daughter, Tyra. As she was looking through her window, which faced the building's front entrance, Ms. Wright saw the Defendant approach the apartment building. (TT 1, pp. 150-51, 175-177, 202-03). Ms. Wright immediately recognized the Defendant as "Ray Ray" -- someone she knew from the Homewood neighborhood where she grew up. (TT 1, pp. 147, 209, 267). Although Ms. Wright did not know the Defendant's real name or know him on a personal level, she knew him "through friends and family members," and she "knew him to see him." (TT 1, pp. 147, 251-52).

Shortly after Ms. Wright saw the Defendant approach the building, she heard someone banging "real[ly] loud and real[ly] hard" on her door, which made her feel "uncomfortable." (TT 1, pp. 146-48, 150, 154, 209, 226, 243). She asked who was at the door, and she heard someone say, "it's [] Ray Ray." (TT 1, pp. 147, 226). Ms.

5

Wright opened her door, saw the Defendant, and asked him why he was banging on her door. (TT 1, p. 148). The Defendant recognized Ms. Wright and looked shocked to see her. (TT 1, pp. 148, 244, 267). He told her that he was unaware that she lived at that apartment. (TT 1, pp. 148, 227, 267). Ms. Wright asked the Defendant who he was looking for, and the Defendant told her that he came to the apartment because he was "looking for some answers." (TT 1, pp. 148, 234, 243, 267). At that point, the victim, Ricky, walked out into the hallway to speak with the Defendant. (TT 1, pp. 148-50, 152).

Ms. Wright heard the Defendant ask Ricky "what is going on" and whether Ricky "had a problem" with the Defendant's people. (TT 1, pp. 148, 267). The Defendant was referring to an incident that had taken place in the hallway of the apartment building between Ricky and three (3) men known as "Tay Tay," "Zombie," and "Judd." (TT 1, pp. 144, 148-49, 188, 190-91, 199). Ricky, Tay Tay, Zombie, and Judd were in the hallway outside of Ms. Wright's apartment at around 4 p.m. that day, and they were overheard having a loud verbal altercation about "someone's brother getting robbed." (TT 1, pp. 140, 144, 188, 190-91, 200, 211, 272-74); (Jury Trial Transcript, Vol. 2 ("TT 2), pp. 158-66). Tay Tay and Judd subsequently went into the apartment of their friend "Nay Nay" (Natwauna Lane), while Ricky and Zombie walked up the street to Zombie's house. (TT 1, pp. 144-45, 190, 203-05, 223, 225, 233). Ricky had returned to the apartment he shared with Ms. Wright shortly before the Defendant started banging on the apartment door. (TT1, p. 146, 233-34, 238).

6

Ms. Wright heard Ricky explain to the Defendant that he did not have a problem with Tay Tay or Judd, and he told the Defendant that "something happened earlier with Zombie," Ricky's friend. (TT 1, pp. 148-50, 190, 222, 267). Ms. Wright was preparing to walk out into the hallway with Ricky and the Defendant, but, as she looked outside of her door, she saw Tay Tay and Judd standing with the Defendant. (TT 1, pp. 149-50, 152-53, 178, 229-30, 235). Ms. Wright also saw Nay Nay (Ms. Lane) standing in the hallway listening to the conversation. (TT 1, pp. 149, 152, 178, 229, 235). Ms. Wright knew that Ms. Lane was her next-door neighbor, but she did not know her personally. (TT 1, pp. 145, 192, 195).

Ms. Wright returned to her apartment and shut the door. However, she then decided to take her daughter across the street to Ms. Wright's mother's house because she had a "funny" feeling about the situation and felt uncomfortable. (TT 1, pp. 150, 153-54, 209). Ms. Wright collected her daughter and walked past Ms. Lane and the group of men on her way out. (TT 1, pp. 153-54, 178). Ricky, the victim, was standing near the main entrance of the apartment building with the Defendant, Tay Tay, and Judd as Ms. Wright left the building with her daughter. Ms. Wright told Ricky to go back into their apartment because he did not "have anything to do with what happened" earlier in the day with Zombie. (TT 1, pp. 153-54, 209). Despite Ms. Wright's request, Ricky did not go back into the apartment. (TT 1, p. 154).

7

On her way out of the building, Ms. Wright saw a friend who agreed to walk her daughter across the street to Ms. Wright's mother's house. (TT 1, p. 153). Ms. Wright stopped in the parking lot in front of the building and spoke with a woman named Brittany, who also had just exited the building. (TT 1, pp. 154-57, 179, 247). As they were talking in the parking lot, the women saw Tay Tay and Judd leave the building, get into a vehicle that had just pulled up, and drive away. (TT 1, pp. 155-56); (TT 2, p. 182). At this point, Ms. Wright decided to move her vehicle from the front to the back of the building because she was worried about something happening to her car. (TT 1, pp. 156-57, 241-42).

Ms. Wright was walking back towards the building after moving her car when she saw the Defendant run past her and heard two (2) girls scream at the sight of him. (TT 1, pp. 157-58, 185). Ms. Wright heard the Defendant yell to the two girls, "homeys, I'm not going to shoot you." (TT 1, pp. 158-59, 185, 256). The two (2) girls appeared frightened and were moving out of the Defendant's way. (TT 1, p. 158). Ms. Wright saw that the Defendant was carrying a black gun in his right hand and running with his hoodie pulled up a "little bit over his face." (TT 1, pp. 158-59,182, 184-85, 187-88). She was able to recognize the Defendant because his hoodie was falling off of his face as he was running. (TT 1, pp. 159, 185).

Ms. Wright did not hear or see the actual shooting take place because she was moving her vehicle, and the music in her car had been playing at a loud volume. (TT 1,

8

p. 160). However, as the Defendant ran past her with the gun, Ms. Wright heard her mother screaming at her to get inside of the building because a shooting had just occurred. (TT 1, p. 160). At this point, everything "clicked," and Ms. Wright feared that something had happened to Ricky. (TT 1, p. 160). She ran back into her apartment building and saw Ricky lying on the floor near Ms. Lane's door, unresponsive. (TT 1, pp. 160-61, 187). Paramedics eventually arrived and transported Ricky to Presbyterian Hospital. (TT1, pp. 162-63). While at the hospital with Ricky's family, Ms. Wright learned that Ricky had died after sustaining multiple gunshot wounds to his trunk and forearm. (TT 1, pp. 51-62, 163).

While still at the hospital, Ms. Wright spoke with Detective Harry Lutton and told him that a person named Ray Ray shot Ricky. (TT 1, pp. 164-65, 269, 295). She agreed to accompany the detectives to police headquarters in order to identify the shooter. (TT 1, pp. 165, 295). Although Ms. Wright did not know Ray Ray's real name, she confirmed to the officers that she would be able to identify Ray Ray if she saw his face again. (TT 1, pp. 165, 170, 172, 295). Ms. Wright was shown a binder filled with photographs and was asked if she recognized the shooter in any of the pictures. (TT 1, pp. 166-67, 170, 297). While looking at the pictures in the book, she recognized the Defendant's face and identified him as the shooter. (TT 1, pp. 167, 171, 254, 264, 298-300). The Defendant was apprehended five (5) days later, after initially attempting to flee from the officers who were executing his arrest warrant. (TT 2), pp. 78, 81-84, 86, 88).

9

## II. DISCUSSION

### A. This court did not abuse its discretion in admitting the Defendant's statements into evidence because they were lawfully obtained and their probative value was not outweighed by the danger of unfair prejudice under Pa. R. E. 403.

The Defendant's first three (3) allegations of error seek to attack the admission of statements that he made after he was taken into custody. The Defendant's first contention -- that the Commonwealth failed to present any evidence to prove that his statements were constitutionally obtained -- should be deemed waived on appeal. (Concise Statement, pp. 3-4).

The Defendant filed a motion on April 2, 2014 seeking, among other things, to suppress statements he made to detectives on August 5, 2013, subsequent to his arrest. (Pretrial Motion, filed on 4/2/14, pp. 10-12). In his motion, the Defendant stated that, after he was arrested, he invoked his *Miranda* rights and "declined to speak with officers without an attorney present." (Id. at 10). However, in the motion, the Defendant immediately conceded that he reinitiated the conversation with the detectives. (Id. at 10). When the Defendant was informed that he was going to be charged with a homicide, he remarked that he was just a drug dealer and that he did not do that kind of thing. (Id.). The detectives then asked the Defendant about the surveillance system at the apartment building, at which point the Defendant said, "That's it. I'm done talking." (Id.).

10

On April 15, 2014, argument was held on the motion. Neither party ever indicated an intention, desire or need to present testimony or anything other than legal argument on the issue of whether the Defendant's statements were admissible. (Pretrial Motion Hearing, 4/15/14, pp. 4-12). In support of the Commonwealth's argument, the Assistant District Attorney provided the following recitation of what transpired on the day of the Defendant's arrest:

> [The Defendant] was informed of his *Miranda* rights, as it were. He expressed the desire not to talk with the detectives. They got up to leave and he said, "Can I ask you a question?" They said, "Okay." And he says, "What is this about?" So they explained, "You are being charged with a homicide," at which point he says, "I'm not into that, I'm a drug dealer. Look at my record." [The detectives] said, "What about the surveillance video?" That's when [the Defendant] says again, "That's it, I'm done talking."

(Pretrial Motion Hearing, 4/15/14, p. 6).

The Defendant never objected to or otherwise disputed the factual accuracy of the Commonwealth's position as to his statements or how they were obtained, and it was clear that the parties were in agreement as to the circumstances surrounding the interview. (Pretrial Motion Hearing, 4/15/14, pp. 5-7). The Defendant conceded that he reinitiated conversation with the detectives, so the sole issue at the hearing was whether the jury should hear the statement, "That's it, I'm done talking." (Pretrial Motion Hearing, 4/15/14, pp. 5-7). The parties agreed, at least implicitly, that an evidentiary hearing was unnecessary since neither party disputed the facts surrounding the Defendant's statements. The Defendant never requested an opportunity to question the detectives as to how his statements were obtained, and he never raised an objection as to the absence of testimony on the issue. Although the Defendant had two (2) different

11

attorneys during the course of his representation, neither one – Mr. Aaron Sontz nor Ms. Carrie Allman -- ever took issue with the fact that only argument was presented in support of the motion. "It is axiomatic that only issues raised by specific objection in the trial court may be addressed on appeal." Commonwealth v. Willis, 552 A.2d 682, 690 (Pa. Super. 1988). Given the Defendant's lack of a specific objection before this court on this issue, the Defendant's first issue should be deemed waived.

The Defendant's second allegation of error is that this court erred by denying his motion to suppress the statement "That is. I'm done talking," because the statement "was obtained in violation of his constitutional rights." (Concise Statement, p. 4). This contention is without merit. It is well-established that an appellate court's "standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." Commonwealth v. DeJesus, 860 A.2d 102, 112 (Pa. 2004) (citation omitted). "Where the record supports the factual findings of the trial court, [the reviewing court is] bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." Commonwealth v. Wells, 916 A.2d 1192, 1194-95 (Pa. Super. 2007).

As an initial matter, the Defendant's characterization of how the events transpired is inaccurate and misleading. The Defendant contends that the statement at issue was unlawfully obtained because, after he "initially invoked his Miranda rights," the

12

"detectives continued to question" him "concerning a topic that was likely to elicit an incriminating response." (Concise Statement, p. 4). However, this case does not involve a scenario where the Defendant invoked his *Miranda* rights but was nevertheless hounded by detectives to abandon his rights and talk. To the contrary, the detectives in this case completely ceased all questioning after the Defendant expressed his initial desire not to speak with them, and they never attempted to pressure him into talking after his initial invocation. The detectives immediately halted the conversation and were preparing to leave the interview room when the Defendant stopped them and inquired whether he could ask them a question. (Pretrial Motion Hearing, 4/15/14, pp. 5-6). The Defendant asked, "What is this about," and the detectives explained that he was being charged with a homicide. (Id. at 6). The Defendant then stated "I'm not into that, I'm a drug dealer. Look at my record." (Id. at 4-6). The detectives followed up his assertion with the question, "what about the surveillance video." It was at this point that the Defendant said "That's it. I'm done talking." (Id. at 6).

"[A] suppression court reviewing a statement made after the defendant's initial invocation of the right to remain silent must recognize as pivotal the purpose for which the renewed interrogation was conducted and the circumstances under which it occurred." Commonwealth v. Harris, 972 A.2d 1196, 1203(Pa. Super. 2009). Specifically,

> judicial inquiry in each instance should focus on the circumstances attending the defendant's invocation of his [] right to silence, as well as the circumstances attending any further attempt at questioning. Hence, *the test should ask whether the official purpose of resuming questioning was*

13

*to entice the arrestee to abandon his right to remain silent, or simply to find out whether he or she had a change of mind. Only then can it be concluded whether, in fact, the defendant's "right to cut off questioning" was "scrupulously honored."*

Harris, *supra*, at 1203 (quoting Commonwealth v. Henry, 599 A.2d 1321, 1325 (Pa. Super. 1991)) (emphasis added). Thus, the critical inquiry in these situations is "whether the police fully respected [the defendant's] right to remain silent, or whether [the defendant] later waived that right." Harris, *supra*, at 1204.

It is clear that the Defendant's statement "I'm done talking" was not the product of any *police-initiated* questioning. His statement was the direct product of his own, voluntary, un-coerced, and unprompted decision to reinitiate conversation with the detectives. The "law is well-settled that a defendant who requests counsel at any time during a custodial interview 'is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*'" Commonwealth v. Edwards, 903 A.2d 1139, 1150 (Pa. 2006) (quoting Edwards v. Arizona, 451 U.S. 477, 484–85 (1981) (emphasis added).

The detectives "scrupulously honored" his initial invocation of his right to remain silent. In fact, they cut off all questioning and were walking out of the room. It was only after the detectives began exiting the room that the Defendant himself stopped them. The circumstances surrounding the interaction demonstrate that the "official purpose" behind the detectives asking about the surveillance video was to simply find out whether

14

the Defendant "had a change of mind" about speaking with them about the incident after he reinitiated conversation. After his initial invocation of *Miranda*, the Defendant expressed his desire to reengage the detectives and discuss the circumstances surrounding his arrest. His "I'm done talking" statement was made after he reinitiated the conversation without any police prompting. Thus, this is not a case in which the detectives "failed to honor a decision to terminate questioning either by refusing to discontinue the interrogation or by persisting in repeated efforts to change [the Defendant's] mind." Commonwealth v. Mignogna, 585 A.2d 1, 6 (Pa. Super. 1990). Nor does this case involve a situation where, "from the moment [the detective] initiated the conversation with the [defendant], [the detective] was attempting 'to entice the [defendant] to abandon his right to remain silent.'" Henry, *supra*, at 1325.

Furthermore, even if the question about the surveillance video was likely to elicit an incriminating response, the Defendant at that point had effectively waived his *Miranda* rights by changing his mind about speaking to the detectives without an attorney and re-initiating conversation. The Defendant expressed that he understood his rights, which was clearly demonstrated by his initial and subsequent invocations, and the detectives had not even had an opportunity to leave the room before he questioned them about why he was arrested. (Pretrial Motion Hearing, 4/15/14, pp. 4-6); (TT 2, pp. 92-93). The Defendant also admittedly is no stranger to the criminal justice system, given his statement that the detectives should look at his criminal record because he is a drug dealer and not a murderer. (Pretrial Motion Hearing, 4/15/14, p. 6) ("I'm not into that, I'm a drug dealer. Look at my record.").

15

Accordingly, the totality of the circumstances indicates that the Defendant knowingly and voluntarily chose to waive his *Miranda* rights after his initial invocation. The fact that he changed his mind for a second time and decided to stop talking does not render his statement inadmissible under *Miranda*. *See* Commonwealth v. Cohen, 53 A.3d 882, 886-87 (Pa. Super. 2012); *See also* Edwards, *supra*, at 1150-51. Since the Defendant prompted the officers into a conversation within seconds after his initial invocation, and since the same detectives were involved, the fact that the detectives did not re-*Mirandize* him or have him fill out another waiver form does not preclude a finding of an effective waiver. *See* Cohen, *supra*, at 887; *See also* Commonwealth v. Baez, 21 A.3d 1280, 1286 (Pa. Super. 2011). Because the Defendant's voluntary statements were not obtained in violation of *Miranda*, this court did not err by denying his motion to suppress.

The Defendant's third allegation of error is that this court erred by admitting his statement "That's it. I'm done talking" because it violated rule Pa. R. E. 403. (Concise Statement, p. 4). The court notes that the "standard of review with respect to evidentiary rulings has been long established: The trial court's rulings will not be disturbed absent an abuse of discretion." Commonwealth v. Einhorn, 911 A.2d 960, 967 (Pa. Super. 2006). "The trial court abuses its discretion if it misapplies the law or [rules] in a manner lacking reason." Id. at 967 (internal quotations omitted).

16

Pursuant to Pa. R. E. 403, "[o]therwise relevant evidence may be excluded if its probative value is outweighed by its potential for prejudice." Commonwealth v. Antidormi, 84 A.3d 736, 750 (Pa. Super. 2014). "'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Commonwealth v. Page, 965 A.2d 1212, 1220 (Pa. Super. 2009) (quoting Pa. R. E. 403). The Defendant argues that the probative value of his statement was outweighed by the danger of unfair prejudice because "the jury may have considered [the statement] as evidence of the Defendant's guilt." (Concise Statement, p. 4). This contention has no merit under these facts.

The statement at issue came on the heels of the Defendant denying his involvement in the homicide, and it was admitted to demonstrate the natural progression of the investigation and explain how the detectives' interview with the Defendant concluded. (Pretrial Motion Hearing, 4/15/14, pp. 5-6); (TT2, pp. 92-94). Had it not been admitted, the jury would have been left with even more questions about what had transpired between the detectives and the Defendant during the interview. There would be virtually no context to explain why the interview ended after the Defendant denied guilt by saying "That's not me. Check me out" after he was told that he was charged with a homicide. Significantly, the Commonwealth did not refer to or otherwise attempt to exploit the Defendant's statement in its opening or closing arguments. (Trial Transcript, Vol. 3 ("TT 3"), 11/25/14, pp. 34-40, 46-68). The court notes that "the mere revelation of silence does not establish innate prejudice," and the admission of the Defendant's statement was not unfairly prejudicial in this case because it simply showed

17

that the Defendant changed his mind about wanting to speak with the detectives after he reinitiated the conversation. Commonwealth v. DiNicola, 866 A.2d 329, 336-37 (Pa. 2005).

However, even assuming for the sake of argument that admission of this statement constituted error, any error was harmless under these facts. This court is aware of the law regarding the general impropriety of referring to a defendant's post-arrest silence. *See e.g.*, Commonwealth v. Mitchell, 839 A.2d 202, 212-13 (Pa. 2003); Commonwealth v. Costa, 742 A.2d 1076, 1077-78 (Pa. 1999); Commonwealth v. Turner, 454 A.2d 537, 540 (Pa. 1982). The concern that forms the basis for not allowing reference to post-arrest silence directly relates to the potential danger that a jury will construe the silence as a "tacit admission of guilt." DiNicola, *supra*, at 336. However, any concern that the jury in this case would construe the Defendant's statement as a tacit admission of guilt was substantially, if not entirely, diminished by defense counsel's closing argument. *See* Commonwealth v. Whitney, 708 A.2d 471, 478 (Pa. 1998) ("Even an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt").

Indeed, defense counsel engaged in a lengthy and thorough explanation to the jury that the Defendant's decision to stop talking to the police was not at all a product of a guilty mind, but rather an intelligent and commendable decision to refrain from

18

speaking any further without an attorney. (TT 3, pp. 38-43). Counsel took a moment to offer the jury "free legal advice" and explained that individuals should never speak to the police without representation, *especially if they are innocent,* because the police may "intentionally or unintentionally misconstrue" their statements. (TT 3, pp. 39-41). Counsel made clear that the Defendant was asserting his innocence and that the only reason he stopped talking was because he decided to simply let the process play out. (TT 3, pp. 39-43). Because counsel's closing argument effectively removed any impression that the Defendant fell silent because he was guilty, and because the prosecution never made reference to the Defendant's statement in its arguments to the jury, any error in allowing the statement is harmless because it is unlikely that the jury equated the Defendant's silence with an admission of guilt. *See* Commonwealth v. Kuder, 62 A.3d 1038, 1052 (Pa. Super. 2013) (explaining that harmless error analysis applies to context of post-arrest silence).

Additionally, it is unlikely that the Defendant's statement, when viewed against the evidence as a whole, contributed to the verdict. The overall case against the Defendant was strong. The jury was presented with testimony from a witness who saw the victim and the Defendant together minutes before the shooting and who saw the Defendant running away from the scene of the shooting, moments after it occurred, with a gun in his hand. This witness identified the Defendant to the police on the same day as the shooting by referencing his nickname, and she was adamant and unwavering in her positive identification of the Defendant through a photo as the perpetrator. She was also adamant and unwavering of her identification of the Defendant as the perpetrator

19

during trial. Additionally, the jury viewed a videotape of the perpetrator fleeing the shooting scene, and a friend of the Defendant indicated that the person on the videotape looked like the Defendant. It is certainly possible that the jury was also able to identify the Defendant from the video.

Accordingly, for all the aforementioned reasons, the Defendant's third contention is without merit.

B. The Pretrial Identification Procedure was not unduly suggestive under these facts, and Tayla Wright's pretrial identification and her in-court identification did not violate the Defendant's due process rights because the identification was made under circumstances that were sufficiently reliable.

The Defendant's fourth allegation of error, that this court erred by not suppressing Ms. Wright's pretrial and in-court identification of the Defendant, is without merit. As noted, an appellate court's "standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." DeJesus, supra, at 112. "Where the record supports the factual findings of the trial court, [the reviewing court is] bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." Wells, supra, at 1194-95.

20

With respect to identification evidence, our appellate courts have explained that:

> [i]n reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable . . . . Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors. . . . [T]he following factors are to be considered in determining the propriety of admitting identification evidence: the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. *The corrupting effect of the suggestive identification, if any, must be weighed against these factors.*

Commonwealth v. Moye, 836 A.2d 973, 976 (Pa. Super. 2003), *appeal denied,* 851 A.2d 142 (Pa. 2004) (citations omitted) (emphasis added).

Notwithstanding the fact that Ms. Wright knew who the Defendant was and knew what he looked like prior to the day of the shooting, the Defendant takes issue with the fact that she picked out his picture in a "gang book" which was organized by neighborhood and had the names of the individuals displayed underneath the pictures. The Defendant's contention arguably would have had merit if the facts involved a stranger identification scenario, but, under these facts, the issue is without merit.

At the suppression hearing held on June 8, 2014, it was established that Ms. Wright spoke with Detective Lutton at the hospital and agreed to accompany Detective Lutton and his partner to the homicide office. This occurred less than two (2) hours after her boyfriend was murdered. (Suppression Hearing Transcript ("ST"), 6/8/14, pp.

21

4-5). As far as the police were concerned, the shooter was still armed and on the loose, and the officers were attempting to locate a suspect. (ST, pp. 8, 42). When they arrived at the homicide office, Ms. Wright told the detectives that the shooter was someone whom she only knew as "Ray Ray." (ST, pp. 7, 17, 19, 29, 41-42). She did not know Ray Ray's first or last name, but she told the detectives that she had known him for a "couple [of] years" and knew that he was from the Homewood area where she was from. (ST, pp. 7-8, 17, 19, 42). Ms. Wright said that she would "definitely" be able to identify the person she knew as "Ray Ray" if she saw his face again, and she never gave any indication that she did *not* know who the shooter was. (ST, pp. 17, 41).

Since Ms. Wright already knew the Defendant, the detectives provided her with a binder that contained 132 photographs. (ST, p. 14). The spine of the binder was captioned "Zone 5 Gang Book," and each page in the book contained eight (8) pictures on each side. (ST, pp. 6, 8-9, 11, 24). The pictures were organized by neighborhood and suspected gang affiliations. Displayed underneath each of the pictures was the name of the individual shown. (ST, pp. 13, 24-28, 37). Since the detectives did not know who "Ray Ray" was at that time, they had no idea if the Defendant's picture would even be contained in the book. (ST, p. 38).

Detective Lutton instructed Ms. Wright to take her time and look through every single picture in the book. (ST, pp. 7-8, 25, 31). Although Ms. Wright indicated that the Defendant was from Homewood, Detective Lutton told her not to focus on particular

22

areas because it was possible that the Defendant could have moved. (ST, pp. 8, 25). Detective Lutton was present the entire time that Ms. Wright looked through the pictures in the binder. He was confident, based on his observations of her as she looked through the binder, that Ms. Wright was only looking at the faces of the individuals and not reading their names. (ST, pp. 9, 13, 18, 31-34). He saw Ms. Wright scrolling her finger across the faces of the individuals, and he saw that she did not rush through the photographs. (ST, pp. 9, 12, 18-19, 31- 33).

Before identifying the Defendant, Ms. Wright came across the photo of a man whom she identified as Tay Tay, one of the individuals that was present in the apartment hallway before the shooting occurred. (ST, pp. 7, 10). Ms. Wright then found the Defendant's face in a photo and identified him as the shooter. (ST, pp. 10-12, 29). The book contained only one (1) photograph of the Defendant, and Ms. Wright identified the Defendant from that photo without any hesitation or uncertainty. (ST, pp. 11-13). The Defendant's photograph was located approximately two-thirds (2/3) of the way through the book, on the backside of the page that contained Tay Tay's picture. (ST, p. 11). It should be noted that Detective Lutton instructed Ms. Wright to continue looking through the rest of the book, even after Ms. Wright identified the Defendant from his photo. (ST, p. 12).

23

Under the totality of the circumstances, the fact that the pictures were organized by gang affiliation and had the names displayed underneath them did not render the identification process unduly suggestive in this case because Ms. Wright already knew that the Defendant was the shooter. Further, the procedure employed was not designed to "emphasize" or single out" any particular suspect. *See* Commonwealth v. Davis, 17 A.3d 390, 394 (Pa. Super. 2011) ("Suggestiveness arises when the police employ an identification procedure that emphasizes or singles-out a suspect."). Moreover, the fact that the names were displayed underneath the pictures was not problematic in this scenario because Ms. Wright did not know the Defendant's real name.

However, even assuming for the sake of argument that the procedure was unduly suggestive, the totality of the circumstances show that it was not "*so impermissibly suggestive* so as to give rise to a substantial likelihood of misidentification in this case." Commonwealth v. Fulmore, 25 A.3d 340, 346 (Pa. Super. 2011) (emphasis added); *See also* Commonwealth v. Kubis, 978 A.2d 391, 396 (Pa. Super. 2009) (noting that "suggestiveness alone does not warrant exclusion"). Courts routinely have explained that "the central inquiry is whether, under the totality of the circumstances, the identification was reliable." Davis, *supra*, at 394 (quoting Moye, *supra*, at 976); Manson v. Brathwaite, 432 U.S. 98, 114 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony").

24

As noted, this is not a situation where Ms. Wright only caught a brief glimpse of a stranger with whom she had no prior familiarity. Ms. Wright saw the Defendant approaching her apartment building through her front window; she saw him and had a conversation with him as he stood in front of her door; she passed him in the hallway as she left the building with her daughter; she saw him running away from the building after the shooting, holding a gun. Ms. Wright had ample opportunity to observe the Defendant. When she first saw him, Ms. Wright immediately recognized the Defendant as someone she knew from the Homewood area where she had grown up. Although Ms. Wright knew that the Defendant was from a particular area, she looked at every single picture in the book and did not specifically focus her attention on any particular neighborhood. Additionally, Ms. Wright never indicated to the detectives that she believed "Ray Ray" belonged to any particular gang, so the fact that the book was organized by gang affiliations is also of no consequence.

Furthermore, Detective Lutton was present the entire time Ms. Wright was going through the binder, and it was clear to him that she was looking at the faces of the individuals, and not their names. Common sense supports the detective's observations since Ms. Wright did not know the Defendant's real name. Significantly, Ms. Wright told the detectives that she would "definitely" be able to identify the Defendant if she saw his face again, and she immediately picked out the Defendant's picture upon seeing it. Ms. Wright identified the Defendant as the shooter just hours after the incident occurred, and she was confident in her identification.

25

Accordingly, Ms. Wright's identification was reliable under the circumstances. In this court's estimation, the identification procedure utilized in this case is similar to the use of a yearbook, which contains photos, names and categorizing information such as grade in school. Courts have upheld the use of yearbooks in identifying perpetrators. *See e.g.*, Haun v. State, 451 Ne.2d 1072, 1075-76 (Ind. 1983); State v. Lucky, 453 So.2d 1234, 1237-39 (La. App. 1. Cir. 1984); United States v. Hanigan, 681 F.2d 1127, 1132-33 (9th Cir. 1982); Little v. State, 475 Ne.2d 677, 681-82 (Ind. 1985); In re Matthew S., 23 A.3d 250, 259 (Md. App. 2011).

Because the pretrial identification was reliable, its admission at trial did not violate the Defendant's due process rights. Additionally, because Ms. Wright's pretrial identification was reliable, Ms. Wright's in-court identification was not tainted and did not violate the Defendant's due process rights. To that end, the court notes that, before Ms. Wright officially identified the Defendant as "Ray Ray" at trial, she testified that she immediately recognized him when she opened her door, and that the Defendant also recognized her and looked shocked to see her. (TT 1, pp. 146-48,156). Ms. Wright had ample opportunity to observe the Defendant given that she interacted with him after she opened her door -- asking him why he was banging on her door and why he was there, questions to which he responded, and then observing him again as she walked past him in the hallway on her way out of the building. (TT1, pp. 146-48, 152-53).

26

On a final note, the Defendant's contention that the Commonwealth failed to present the testimony of Ms. Wright at the suppression hearing to demonstrate the reliability of the identification should be rejected outright and deemed waived. (Concise Statement, p. 4). During the suppression hearing, defense counsel dismissed the need to have Ms. Wright testify and stated that the "suppression motion is regarding the procedural aspects of the identification" and that he was "*not so much concerned about the fact that she identified my client.*" (ST, p. 16) (emphasis added). Counsel explained that his motion was only challenging the procedural aspects of the identification procedure that was employed, and he stated that "regarding facts such as how long this witness had the opportunity to observe the Defendant, that goes beyond the procedural aspects. That goes to the weight and credibility of her identification," which he was not challenging. (ST, p. 16). Accordingly, the Defendant's contentions that this court erred in not having testimony by the witness at the suppression hearing are meritless, and this court did not err in denying the motion to suppress her pretrial and in-court identification.

C. This court did not abuse its discretion by allowing Detective Hal Bolin to impeach Natwauna Lane with statements she made to him days before trial because the probative value of her prior inconsistent statement was not outweighed by the danger of unfair prejudice under Pa. R. E. 403.

The Defendant argues that this court abused its discretion by admitting Natwauna Lane's prior inconsistent statement because the statement was unfairly prejudicial under Pa. R.E. 403. (Concise Statement, p. 5). As noted earlier, a trial court's evidentiary rulings "will not be disturbed absent an abuse of discretion." Einhorn,

27

*supra*, at 967. "The trial court abuses its discretion if it misapplies the law or [rules] in a manner lacking reason." Id. at 967 (internal quotations omitted). Pursuant to Pa. R. E. 403, "[o]therwise relevant evidence may be excluded if its probative value is outweighed by its potential for prejudice." Antidormi, *supra*, at 750. However, "[e]vidence will not be prohibited merely because it is harmful to the defendant." Id. at 750. Indeed, the court is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand . . . ." "[E]xclusion is limited to evidence *so prejudicial* that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." Id. at 750 (quoting Commonwealth v. Owens, 929 A.2d 1187, 1191 (Pa. Super. 2007)).


As the Defendant acknowledges, the central issue at trial concerned the identity of the shooter. Two (2) days before Natwauna ("Nay Nay") Lane testified at trial, she met with Detective Bolin and told him that she saw the Defendant on the day of the shooting talking to the victim in the hallway of the apartment building. (TT 2, p. 260). This statement was made verbally to the detective and was not recorded in any fashion. (TT 2, pp. 260, 269-70). In light of the information that Ms. Lane provided to the detective immediately before trial, the Commonwealth chose to call her as a witness. The Commonwealth had every right to expect that Ms. Lane would testify consistently with the statement she had made just days earlier. (TT 2, pp. 144, 203, 208-09, 215, 221). However, when Ms. Lane took the stand and testified, she insisted that she did not see the Defendant in the apartment building on the day of the shooting. (TT 2, pp. 170-72, 184, 185, 240, 242, 247). Ms. Lane was then confronted with the prior

28

statement made to Detective Bolin during her testimony, and she denied making it. (TT 2, pp. 202, 237-242).

"The general rule is that a prior inconsistent statement of a declarant is admissible to impeach the declarant." Commonwealth v. Brady, 507 A.2d 66, 68 (Pa. 1986). Consistent with the rules of evidence, Ms. Lane's statement was admitted for the sole purpose of impeachment because it did not meet the criteria for admission as substantive evidence under Pa. R.E. 803.1. The court allowed Detective Bolin to testify about the conversation he had with Ms. Lane mere days before she testified because her statement was materially inconsistent with her trial testimony. (TT 2, pp. 260, 269-75).

Contrary to the Defendant's argument, the probative value of Ms. Lane's prior inconsistent statement was not outweighed by the danger of *unfair* prejudice. The inconsistency related to a key issue at trial, namely identification. Ms. Lane's testimony at trial directly contradicted the testimony of Ms. Wright, who testified that the Defendant was present in the hallway, as was Ms. Lane. It was vital for the jury to assess the credibility of the two (2) women in order to resolve the issue of identification. Ms. Lane's statement to Detective Bolin provided the jury with a proper context in which to weigh her testimony and determine whether she testified credibly at trial. Although the Defendant argues that "there was a great risk that, despite a cautionary instruction, the jury would consider Ms. Lane's alleged statements . . . as substantive evidence of Mr.

29

Williams' guilt," this argument relies on nothing but mere speculation. (Concise Statement, p. 5). The Commonwealth never attempted to suggest that this statement should be considered as the truth, and the jury was instructed multiple times that it must not consider her statement for anything other than credibility purposes. Such cautionary instructions are routinely given, and there is no indication that jurors ignore them.

Indeed, at the time that the prior inconsistent statement was admitted, this court strongly cautioned the jury that it may only consider the statement to assess the credibility of the witness. (TT 2, p. 260). Specifically, the court provided the following instruction:

> Ladies and gentlemen of the jury, you should be aware that this evidence is not to be considered by you for the truth of the matter. [] So it's not for the truth of whether or not Nay Nay actually saw the defendant in the hallway. This testimony can only be considered by you as to the credibility of Ms. Lane. [] That is the only way that you can consider it. [] So you must follow these instructions. As I told you earlier, I am the judge of the law, so you must follow that instruction. It's only to be considered for credibility, not to be considered for the truth of what has just been stated. Thank you. (TT 2, p. 260).

The cautionary instruction was repeated a second time during the court's closing charge to the jury. (Trial Transcript, Vol. 3 ("TT 3"), 11/25/14, p. 89). "[T]he jury is presumed to follow the trial court's instructions," and there is no articulable reason to believe that the jury disregarded the court's instruction as to this matter. Commonwealth v. Baez, 720 A.2d 711, 727 (Pa. 1998).

Additionally, the inquiry here is whether the statement was "*so prejudicial* that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." Antidormi, *supra*, at 750. The statement at issue was not so prejudicial so as to be inflammatory because Ms. Lane's statement did not place a gun in the Defendant's hand, and it did not otherwise suggest that she saw the Defendant participate in the shooting. In fact, the statement did not even suggest that Ms. Lane was present when the shooting took place.

In light of the cautionary instructions that were provided, the presumption that the jury adhered to these instructions, the importance of allowing the jury to make proper credibility determinations, and the lack of unfair prejudice, the admission of Ms. Lane's prior inconsistent statement as impeachment evidence did not violate Pa. R. E. 403.

D. This court did not abuse its discretion in denying the Defendant's post-sentence motion because the verdict did not shock the conscience

In his sixth allegation of error, the Defendant contends that this court abused its discretion in denying his post-sentence motion because the verdict was against the weight of the evidence. It is well-established that:

the weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, [the appellate court] may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim

31

below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

Commonwealth v. Lewis, 911 A.2d 558, 565 (Pa. Super. 2006); See also Commonwealth v Smith, 861 A.2d 892, 895-96 (Pa. 2004). "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." Commonwealth v. Hunzer, 868 A.2d 498, 506-507 (Pa. Super. 2005). However, "[q]uestions concerning inconsistent testimony ... go to the credibility of witnesses" and the court "cannot substitute its judgment for that of the jury on issues of credibility." DeJesus, supra, at 107; See also Commonwealth v. Williams, 854 A.2d 440, 445 (Pa. 2004) ("In criminal proceedings, the credibility of witnesses and weight of evidence are determinations that lie solely with the trier of fact, [which] is free to believe all, part, or none of the evidence.").

In determining whether a trial court abused its discretion in denying a weight claim, our Supreme Court has noted that

> a new trial should not be granted *because of a mere conflict in the testimony* or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

32

Commonwealth v. Clay, 64 A.3d 1049, 1054-55 (Pa. 2013) (internal quotations and citations omitted) (emphasis added). "[T]he trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." Commonwealth v. Cousar, 928 A.2d 1025, 1036 (Pa. 2007).

The Defendant's challenge to this court's denial of his weight claim is without merit as it is based entirely on issues of witness credibility and conflicts in the testimony. The Defendant claims that the testimony of Tayla Wright, the Commonwealth's central witness, was unworthy of belief. However, the law is clear that the fact-finder is free to believe "all, part, or none of the evidence." Williams, supra, at 445. This court sat through the trial and had the opportunity to observe the witnesses and their demeanor. In this court's opinion, Tayla Wright was a credible witness who never wavered in her identification of the Defendant as the shooter. It should be noted that this court also sat as a trier-of-fact, and its decision to convict the Defendant of Person Not to Possess was based, in part, on its determination that Tayla Wright was a credible and truthful witness.

As recounted above, Ms. Wright was present during the time of the shooting, and she saw the Defendant running away from the building immediately after the shooting with a gun in his hand. (TT1, pp. 157-60, 185). Ms. Wright testified consistently and credibly that she knew of the Defendant

33

prior to the incident. (TT 1, pp. 146-47, 209, 251-52). Although she knew him only as "Ray Ray," she immediately recognized him when she opened her door and came face to face with him. (TT 1, pp. 147, 252, 267). The fact that the Defendant was banging on her door, demanding "answers" and questioning whether Ricky had a problem with his "people" made her so uncomfortable that she removed her daughter from the apartment and made sure that she was away from the Defendant's vicinity. (TT 1, pp. 146-50, 153-54, 209, 240-41, 243, 267).

Although she saw two (2) other men in the hallway with the Defendant and Ricky before she left the building, she saw those men exit the building, get into a car, and leave before any shots were fired. (TT 1, pp. 152-53, 155-57). Moments after she got out of her car, Ms. Wright heard her mother scream from across the street that a shooting had just occurred, and she immediately turned to see the Defendant running away from the building with a gun in his hand. (TT 1, pp. 158-60, 184-85, 187). The Defendant looked so intimidating running away from the apartment that he had to reassure two girls in his vicinity that he was not going to shoot them after they screamed at the sight of him. (TT 1, pp. 157-59, 185, 256).

Furthermore, Ms. Wright did not hesitate to tell the police that the Defendant was the shooter. She immediately told the detectives that Ricky was killed by a man that she only knew as "Ray Ray", and she voluntarily agreed to

34

go to the police station so that she could assist in the investigation. (TT 1, pp. 165, 170, 172, 269, 295). Ms. Wright immediately picked out the Defendant's face after viewing over a hundred pictures, all within a few hours after the shooting occurred. (TT 1, pp. 164-67, 170-71, 218, 226, 269, 295, 301).

The court notes that Ms. Wright's testimony was not weakened by Ms. Lane's testimony at trial. Ms. Lane testified that she was friends with Tay Tay and Judd, and she corroborated Ms. Wright's account that there had been an incident in the hallway around 4:00 p.m. on the day of the shooting that involved Tay Tay, Judd, Zombie, and Ricky. (TT 2, pp. 155-68). The incident involved Zombie and his suspicion that one of the men robbed his brother. (TT 2, pp. 159-60, 164-68). Ms. Lane also corroborated Ms. Wright's testimony that she saw Zombie leave the building after the 4 p.m. incident and that Tay Tay and Judd left the hallway and building area before the shooting occurred. (TT 2, p. 169, 182-83).

Ms. Lane testified that she knew the Defendant, and she knew that he was friends with Tay Tay and Judd. (TT2, pp. 171, 184, 251-52). When confronted with the building's surveillance video, Ms. Lane immediately, and without hesitation, agreed that the person on the video "looked like Ray Ray." (TT 2, pp. 171, 245 ). The Defendant suggests that this statement is insignificant because Ms. Lane's overall testimony at trial was that she did not see the Defendant in the

35

apartment building on the day of the shooting. (TT 2, pp. 170-71, 185, 198, 240, 242, 247, 252, 301). However, as previously discussed, Ms. Lane's credibility at trial was directly at issue in light of the prior inconsistent statement that she had made to Detective Bolin two (2) days before she took the stand, where she admitted that she did see the Defendant in the apartment building on the day of the shooting. (TT 2, pp. 259-60). While Ms. Lane's prior inconsistent statement could not be considered as substantive evidence, the statement served to cast doubt on her testimony that she did not see the Defendant on the day of the shooting, particularly when considered against the fact that Ms. Wright testified numerous times that Ms. Lane was present in the hallway during the encounter between the Defendant, Ricky, Tay Tay, and Judd. (TT 1, pp. 152-53, 178, 183, 229-30, 235, 243, 261).

The court also notes that another Commonwealth witness, Stephen Brower, lent credibility to Ms. Wright's testimony that the Defendant ran out of the building with his shirt pulled over his head. Mr. Brower was in the parking lot at the time of the shooting, and he testified that he saw someone fleeing from the building with "something white pulled over their head." (TT 1, p. 287). As recounted above, Ms. Wright testified that she was able to recognize the person who was running with the gun in his hand as the Defendant because the hoodie that he had pulled over his face kept sliding down. (TT 1, pp. 158-59, 184-85). Ms. Wright's testimony was further bolstered by the video from the surveillance

36

camera, from which it is possible to identify the Defendant and which supports Ms. Wright's testimony of the aftermath of the shooting.

While the murder weapon was never recovered and no forensic evidence connected the Defendant to the crime, these facts were not, and are not, required to establish guilt beyond a reasonable doubt. (Trial Transcript, Vol. 2, ("TT 2") pp. 43-47, 51, 66, 68). The court also notes that, although the Defendant presented an alibi defense at trial and claimed that he was at Chuck E. Cheese celebrating his son's first birthday party at the time of the crime, the alibi was presented by the Defendant's family members only. Aside from their testimony, there was no other objective evidence of the Defendant's presence at the party. (TT 2, pp. 312-315, 317-320, 322-336).

Against this backdrop, the verdict did not, and does not, shock the conscience of this court, which had the opportunity to listen to the witnesses and review the exhibits first-hand. The Defendant has failed to show that certain facts were "so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." Clay, supra, at 1054-55. Although Ms. Wright did not see the Defendant actually pull the trigger, the circumstances surrounding the incident, and the reasonable inferences drawn therefrom, established beyond a reasonable doubt that the Defendant killed Derrick Lyman.

37

It was solely the function of the jury to weigh the evidence and make credibility determinations.

The verdict of the jurors indicates that they rejected the Defendant's alibi, credited Ms. Wright's testimony that the Defendant was the triggerman and rejected Ms. Lane's trial testimony that she did not see the Defendant on the scene. While there may have been a few instances in Ms. Wright's testimony that were unclear or inconsistent, the jury could have very well concluded that any inconsistencies in her testimony were not necessarily a product of dishonesty, but rather a result of time, trauma, faulty memory, etc. In any event, the law is clear that a court "cannot substitute its judgment for that of the jury on issues of credibility." DeJesus, supra, at 107. Accordingly, this court did not abuse its discretion in denying the Defendant's post-sentence motion, and this contention should be rejected

E. This court did not abuse its discretion by allowing Detective Lutton to testify to Tayla Wright's statements made shortly after the shooting.

Finally, the Defendant contends that it was error for this court to allow Detective Lutton to testify as to statements that Tayla Wright made to him on the same day as the shooting. (Concise Statement, pp. 5-6). This argument is without merit. As noted above, the "[a]dmission of evidence is a matter within the

38

sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion." Commonwealth v. Handfield, 34 A.3d 187, 207-08 (Pa. Super. 2011). "Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record." Id.

The Defendant asserts that Ms. Wright's statements were inadmissible because defense counsel "was not given an opportunity to cross-examine the witness about the statements," and no exceptions to the hearsay rule applied. (Id. at 6). The prior consistent statement at issue concerns Ms. Wright's statement to Detective Lutton at the hospital. (TT 1, pp. 291-95). Detective Lutton testified that, when he arrived at the hospital to check on the condition of the victim, he made contact with the family and asked whether anyone had information about what had happened to Ricky. (TT 1, p. 290). Ms. Wright began explaining to the detective that there had been an argument outside of her apartment earlier that day and that her boyfriend Ricky had been present for the argument. (TT 1, pp. 291, 294). At that point, Detective Lutton stopped her from saying anything further and asked if she would be amenable to speaking with them at the homicide office. (TT 1, pp. 294-95). Detective Lutton testified that Ms. Wright agreed to go to the office with them, and when they arrived there, Ms. Wright told them that a guy named "Ray Ray" was the individual who was responsible for shooting Ricky. (TT 1, p. 295).

39

Detective Lutton testified as to Ms. Wright's prior consistent statements after Ms. Wright had already completed her testimony. During her direct examination, Ms. Wright recounted the argument that had taken place around 4 p.m. that afternoon outside of her apartment. (TT 1, pp. 139-141, 143-45, 149). She also testified that she spoke with Detective Lutton at the hospital and that she started to tell him what had happened. (TT 1, pp. 164-65). Ms. Wright was then subjected to a lengthy cross-examination, during which her credibility was directly attacked and put at issue. (TT 1, pp. 188-262). The defense was heavily focused on challenging Ms. Wright's statements and the perceived inconsistencies in her testimony. (TT 1, pp. 193-94, 206-08, 210-212, 217-220, 222-232, 234, 243-46). The Defendant had ample opportunity to question her as to the statements she made to Detective Lutton at the hospital, and his counsel certainly took advantage of the opportunity to ask her about the earlier argument that occurred outside of her apartment on the day of the shooting. (TT 1, pp. 188-203).

Rule 613(c) of the Pennsylvania Rules of Evidence provides as follows:

Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes if *the opposing party is given an opportunity to cross-examine the witness about the statement*, and the statement is offered to rebut an express *or implied* charge of:

(1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or

40

(2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation. Pa.R.E. 613(c) (bold in original).

The Defendant's cross-examination of Ms. Wright directly put her credibility at issue and highlighted questions regarding faulty memory and/or bias. The Defendant had ample opportunity to cross-examine Ms. Wright as to the statements she made to Detective Lutton, and he conducted a lengthy and exhaustive cross-examination of Ms. Wright. Based on these facts and circumstances, this court did not abuse its discretion in allowing Detective Lutton to recount what Ms. Wright told him at the hospital. (TT1, pp. 291-295); See Commonwealth v. Hutchinson, 556 A.2d 370, 372 (Pa. 1989) (noting that prior consistent statements may be proved by the person to whom they were made in order to support the credibility of the witness whose testimony has been attacked).

However, even assuming for the sake of argument that Ms. Wright's statement at the hospital should not have been admitted as a prior consistent statement, the statement was entirely relevant to show Detective Lutton's course of conduct and to explain the steps that were undertaken in his investigation of the shooting. See Commonwealth v. Chmiel, 889 A.2d 501, 532 (Pa. 2005) ("[I]t is well established that certain out-of-court statements offered to explain the course of police conduct are admissible because they are offered not for the truth

41

of the matters asserted but rather to show the information upon which police acted.").

Significantly, Ms. Wright's statements about there being an argument earlier that day did not refer to the Defendant or otherwise implicate the Defendant in any way. The statement also was not "highly incriminating" in nature since it did not involve "specific assertions of criminal conduct on the part of the accused." *Compare* Commonwealth v. Palsa, 555 A.2d 808, 811 (Pa. 1989) (statement not admissible under course of conduct exception where it accused the defendant of being a drug purchaser and defendant was on trial for drug offense). Ms. Wright's statement about the earlier argument "provided only the information necessary for a reasonable understanding of the police conduct" and was, therefore, admissible to show the detectives' course of conduct pertaining to their investigation of the shooting, and not to establish the truth of the matter. Palsa, *supra*, at 811. To that end, the court specifically instructed the jury that Ms. Wright's prior consistent statement was not to be considered for the truth of the matter and was only relevant to help them assess her credibility. (TT 3, p. 91).

Finally, the court notes that, with the exception of Ms. Wright's brief reference at the hospital to the argument that had occurred earlier that afternoon outside of her apartment, the statements that Detective Lutton recounted mainly

42

concerned Ms. Wright's identification of the Defendant as the shooter. Statements of identification are not considered to be hearsay. (TT 1, pp. 291-305); *See* Commonwealth v. Wilson, 861 A.2d 919, 929 (Pa. 2004) ("Where . . . the prior consistent statement is one of identification, it is admissible as an exception to the hearsay rule . . . ."). Accordingly, for the aforementioned reasons, the court did not abuse its discretion in allowing Detective Lutton to testify as to Ms. Wright's statements.

## III.  CONCLUSION

The Defendant's allegations of error are without merit. The Defendant waived his argument regarding the absence of testimony presented in support of the motion to suppress his own statements; his statements were lawfully obtained; and their admission did not violate Pa. R. E. 403. The court did not err by denying the motion to suppress Ms. Wright's pretrial or in-court identification because the identification procedure was not unduly suggestive, and, even if it was, the identification was reliable. The court did not err by allowing Detective Bolin to impeach Ms. Lane with her prior inconsistent statement because the probative value of this impeachment evidence was not outweighed by any unfair prejudice. The court did not err by denying the Defendant's post-sentence motion because the verdict did not shock the conscience. The court did not abuse its discretion by allowing Detective Lutton to testify to Ms. Wright's prior consistent statements because Ms. Wright's credibility was directly attacked, and the statements of identification were not considered hearsay.

43

For the foregoing reasons, the verdicts and sentences in these cases should be upheld.

BY THE COURT:

Beth A. Lazzara, Judge       , J.

1/19/16

Date